**MONTE CHRISTO DRILLING CORPORATION, Appellant,**

v.

**UNIVERSAL INSURANCE COMPANY et al., Appellees.**

**No. 24057.**

United States Court of Appeals Fifth Circuit.

April 18, 1967.

Rehearing Denied June 1, 1967.

Griffin B. Bell, Circuit Judge, dissented.

Orebo v. United States, 293 F.2d 747 (9th Cir. 1961), cert. denied, 368 U.S. 958, 82 S.Ct. 402, 7 L.Ed.2d 389 (1962).

Morris Atlas, Gary Gurwitz, McAllen, Tex., Atlas, Schwarz, Gurwitz & Bland, McAllen, Tex., for appellant.

Owen D. Cox, Corpus Christi, Tex., Franklin D. Houser, San Antonio, Tex., Boone, Davis, Cox & Hale, Corpus Christi, Tex., Donald G. Gay, Spafford, Freedman, Hamlin, Gay & Whitham, Dallas, Tex., for appellees.

Before BELL and GODBOLD, Circuit Judges, and NOEL, District Judge.

GODBOLD, Circuit Judge:

Monte Christo Drilling Corporation took out with Universal Insurance Company a policy titled "Special Oil and Gas Drilling Equipment Policy" covering designated oil well drilling equipment against direct physical loss or damage by various perils.[1]

When Monte Christo suffered the loss here in question its mast or derrrick[2] had been raised and put into an upright position and drilling had commenced. At a time when drilling was not in progress (in the sense that the bit was not in the ground and turning) the bail, which is a portion of the hook and bail assembly (a large block and tackle suspended from the mast), was being used to pull pipe out of the hole. The bail broke and caused damage to the rig, its sub-structure and to machinery of the rig. It did not strike the mast, and the mast did not pull in or collapse.

The policy is not a general coverage policy but a specified risk policy, so that any loss must come under a particular coverage for there to be liability. Monte Christo claims there is coverage under Item 7-k, "damage resulting from the raising or lowering operations of the derricks or mast." Universal says 7-k covers only raising of the mast from horizontal to vertical position while being set up in place preparatory to commencement of drilling activities, and lowering of the mast from vertical back to horizontal after drilling activities have terminated. Monte Christo claims 7-k covers any work ("operation") which is in the nature of raising or lowering and done by means of, or with, the mast after it is in place and before it is taken down.

The District Court, in a trial without a jury, held the policy was not ambiguous, that the only meaning it could have

---

1. "7. THIS POLICY INSURES AGAINST DIRECT PHYSICAL LOSS OR DAMAGE BY:
   a. Fire and Lightning;
   b. Tornado, Cyclone, Windstorm, and Hail;
   c. Explosion above the surface of the ground (except as respects Item 8a);
   d. Strikes of Assured's employees; Riot or Civil Commotion;
   e. Collision, Upset or Overturn of the Transporting Land Conveyance while in transit from one location to another (excluding while at an operating or stacked location or being erected thereon) including collision of the Load with any stationary object while in transit; overturn of the insured unit while being skidded (except while being loaded or unloaded) on wheels or skids from one operating location to another; Marine perils while being transported on a regular ferry line.
   f. Collapse of Bridges or Culverts;
   g. Aircraft or objects falling therefrom;
   h. Vandalism and Malicious Mischief;
   i. Blowout and Cratering (as hereafter defined);
   j. THEFT except as a result of mysterious disappearance or inventory shortages;
   k. DAMAGE RESULTING FROM THE RAISING OR LOWERING OPERATIONS OF THE DERRICKS OR MAST;
   l. DAMAGE RESULTING FROM THE PULL-IN OR THE COLLAPSE OF THE DERRICKS OR MAST;
   m. DAMAGE RESULTING FROM LOADING OR UNLOADING the insured property from or onto a transporting vehicle;
   n. FLOOD, meaning rising waters in lakes, streams or rivers."

2. The terms "mast" and "derrick" are used interchangeably in the industry, and we do the same here; a derrick has to be erected and assembled, whereas a mast is raised and lowered and moved from site to site complete.

was that given it by Universal, and denied liability. We disagree, reverse and remand.

A number of provisions make the policy susceptible of more than one interpretation. We need go no further than 7–k itself, which is subject to different constructions because of the word "operations". If raising and lowering the derrick are the only perils covered by 7–k, "operations" is surplusage. Item 7–m adds to the doubt in meaning of 7–k, covering "damage resulting from loading or unloading the insured property from or onto a transporting vehicle"; the word "operation" is not there included.

A rider was attached to the policy stating warranties and limitations of liability.[3] The first paragraph, by referring to operations conducted *with* a derrick, can be construed as embracing a broader scope of activities than movement of the derrick alone. In determining whether there is an ambiguity the word "including" is not, as Universal claims, to be treated as a matter of law as a word of enlargement used to indicate something added or not otherwise included. It can be construed as a word describing a specific type of operation— i. e., "raising or lowering operations"— within the general class of "operations conducted with the insured mast or derrick."

Universal asserts that the last clause of the first paragraph of the rider, "and specifically that the manufacturers rated load limit of such derrick or mast (excluding safety factor) shall not be exceeded" relates only to 7–l, although the first clause of this warranty refers to 7–k and 7–l. This is not the only possible conclusion; in fact it is a dubious one. The description of duties of care which the insured warrants it will observe, following after the description of operations, is conjunctive throughout, requiring due diligence and accordance with the safe operating practice recommended by the manufacturer, and specifically that the rated load limit of the derrick not be exceeded. Also "rated load limit" appears to us to be relevant to things done with the mast rather than putting it up and taking it down. We see nothing in this paragraph to limit its application to 7–l in the face of its statement that it applies to 7–k as well.

The last paragraph of the rider (see footnote 3) can be construed to be a limitation of damage caused by the traveling block assembly after the derrick is raised and before lowered and having nothing to do with raising or lowering of the derrick. If coverage were not extended by

---

3. "The Assured Warrants, as respects coverage 7. (k) and 7. (l) Described in the face of this policy, that the operations conducted with the insured derricks or masts, including raising or lowering operations, shall be with due diligence and in accordance with the recommended safe operating practice of the manufacturer of such derrick or mast and specifically that the manufacturers rated load limit of such derrick or mast (excluding safety factor) shall not be exceeded.

"The Assured further warrants that as respects derricks or mast raised by a hydraulic mechanism the manufacturers recommendations as to bleeding hydraulic lines and rams and the operation of pumps and general procedure shall be adhered to at all times; as respects derricks or mast raised or lowered by wire lines the bridle, guy lines, if any required, and raising lines shall be inspected before each raising operation and if broken strands are apparent such wire lines will be replaced before commencing raising operations.

"Failure of the Assured to comply with the foregoing warranties shall limit this Company's liability at the time of loss or damage, resulting from the perils insured against in 7. (k) and 7. (l) and as result of windstorm if proper guy lines are not in use, to 50% of the amount of loss or damage and the deductible specified herein shall be applied to the Company's participation only.

"The coverage afforded under 7. (k) or 7. (l) shall not extend to damage resulting from the traveling assembly striking the derrick or mast or the Crown Block while being operated or to breaking of the hoisting lines on the traveling assembly, unless such damage results in the Derrick or Mast being completely collapsed and falling to the ground."

both 7–k and 7–l to damage incurred while the mast is in place there would be no reason for this exclusion from coverage to be applicable to 7–k. Nothing in the paragraph is in terms of raising or lowering. Recognizing the problems this last paragraph raises, Universal suggests it be treated as though the words "7.(k) or" did not appear in the paragraph at all. This is not the way to determine whether or not a contract is ambiguous.

The District Court reasoned that the policy was intended to exclude drilling and that the raising and lowering of pipe is a part of drilling. But the policy is one of specified risks. It nowhere states that drilling is excluded. In fact, other provisions indicate intent that drilling is not excluded.[4]

No purpose would be served by referring to portions of the policy that appear to say the loss is not covered. We have referred to sufficient portions to indicate the policy is subject to more than one reasonable interpretation and as such is to be construed under principles applicable to an ambiguous contract; such construction is a matter for the District Court.

Reversed and remanded.

GRIFFIN B. BELL, Circuit Judge (dissenting):

I respectfully dissent. This matter had the careful consideration of the District Court. See Monte Christo Drilling Corporation v. Universal Insurance Company, S.D.Tex., 1966. I agree with the District Court that there was no coverage, and also that the insurance contract was not ambiguous. This was a specific risk contract and it is clear to me under the terms of the contract that appellant simply did not purchase coverage of the kind which forms the subject matter of this suit. We should affirm.

---

4.        "LIMITATIONS

"10. DRILLING WITH GAS, AIR OR OIL—It is a condition of this Policy that Gas, Air or Oil (except commercial Oil Base Mud or Oil used to free stuck drill stem or to displace mud at the completion of a well) will not be used for Circulating, Drilling or Drilling-in wells unless such operations are reported to the Company in advance and an additional premium charge made as may be required. Failure of the Assured to notify the Company of such operations in writing, and to have the same approved by the Company in writing, shall render this Policy null and void as respects the Unit involved during the time such violation exists. No return premium shall be permitted while coverage is suspended as a result of this provision.

*      *      *      *      *

"EXTENSIONS

"12. IN-HOLE EQUIPMENT and SALVAGE EXPENSE—(a) It is agreed that should the Drill Stem in use below the surface become stuck as a direct result of an insured peril or in accordance with the definition of Blowout or Cratering (Paragraph 9), the liability of this Company shall be limited to the Assured's contractual liability with the Well Owner(s) for operations conducted on a footage basis. This insurance shall not extend to liability assumed for such In-Hole Equipment while operations are conducted on a daily or hourly rate basis except as a result of Fire or Windstorm, Salvage expense (excluding mud, chemicals, and cement expense) shall be allowed in accordance with the Assured's responsibility for such In-Hole Equipment as specified herein and shall be limited to that proportion of the expense which the Assured must bear, that the value of the drill stem in the well at the time of loss bears to the combined value of the drill stem in the well plus the value of the well at the time of loss. In no event shall this Company be liable under this extension for Salvage Expense and/or any loss or damage to the drill stem for an amount in excess of the value of the drill stem in the well at the time of loss nor shall there be any liability in the event that drill stem is left in the well and through which an oil or gas well is completed. There can be no abandonment to this Company of any In-Hole Equipment without the Assured making every effort, within customary and safe operating practices, to recover the property lost or stuck in the well;"